RENDERED: SEPTEMBER 18, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0235-DG

BILL DUNN, MCCRACKEN COUNTY                APPELLANT
PROPERTY VALUATION
ADMINISTRATOR

                 ON REVIEW FROM COURT OF APPEALS
V.                    NO. 2022-CA-0399
          MCCRACKEN CIRCUIT COURT NO. 21-CI-00191

SOLOMON FOUNDATION; AND                APPELLEES
KENTUCKY DEPARTMENT OF
REVENUE

AND

2023-SC-0236-DG

DEPARTMENT OF REVENUE,                APPELLANT
FINANCE AND ADMINISTRATION
CABINET

                 ON REVIEW FROM COURT OF APPEALS
V.                    NO. 2022-CA-0401
          MCCRACKEN CIRCUIT COURT NO. 21-CI-00191

BILL DUNN, MCCRACKEN COUNTY              APPELLEES
PROPERTY VALUATION
ADMINISTRATOR; AND THE
SOLOMON FOUNDATION, INC.

**OPINION OF THE COURT BY JUSTICE NICKELL**

**REVERSING AND REMANDING**

Section 170 of the Kentucky Constitution provides in pertinent part, "[t]here shall be exempt from taxation . . . real property owned and occupied by . . . institutions of religion[.]"  The Solomon Foundation ("Solomon") applied for an exemption under this provision which was denied by McCracken County Property Valuation Administrator Bill Dunn ("PVA").  The denial of the exemption was affirmed by the McCracken County Board of Assessment Appeals ("Board of Assessment") whose decision was subsequently affirmed in turn by the Kentucky Board of Tax Appeals ("Tax Board").  Upon judicial review, the McCracken Circuit Court reversed the Tax Board and held Solomon was entitled to the exemption.  The Court of Appeals affirmed the opinion and order of the trial court.  We granted discretionary review.[1]  Having carefully reviewed the law, record, and briefs, we reverse the decision of the Court of Appeals and remand with instructions to reinstate the denial of the exemption by the Tax Board.

## I. PROPER PARTIES AND RECORD ON APPEAL

At the outset, we must address two preliminary matters involving the status of the parties and the state of the record on appeal.  Solomon first objects to PVA and Revenue proceeding as separate parties and further argues

---

[1] PVA and the Commonwealth of Kentucky, Finance and Administration Cabinet, Department of Revenue ("Revenue") have proceeded as separate parties and filed separate motions for discretionary review.  We have elected to consider both appeals together in a single opinion.

these entities possess a single, undifferentiated interest in the outcome of this litigation. We may briefly dispose of this argument on the grounds of waiver.

In its petition for appeal and amended petition for appeal before the Tax Board, Solomon named PVA and Revenue as separate parties.[2] Moreover, our review of the administrative record failed to uncover any objection by Solomon to the capacity of PVA and Revenue to proceed as separate parties. "It is well settled that failure to raise an issue before an administrative body precludes the assertion of that issue in an action for judicial review, or as an initial matter on discretionary review to this Court." *Urella v. Kentucky Bd. of Med. Licensure*, 939 S.W.2d 869, 873 (Ky. 1997). In addition, we discern no issues of constitutional standing here because there is no indication that either PVA or Revenue individually *lack* a sufficient legal interest in these proceedings. *City of Pikeville v. Kentucky Concealed Carry Coalition, Inc.*, 671 S.W.3d 258, 263 (Ky. 2023) (holding a court must determine for itself whether parties possess constitutional standing). On the contrary, Solomon's claim is that PVA and Revenue merely share the same interest.

Solomon next argues PVA's citation to matters outside the administrative record should not be considered by this Court. We agree.

In an attempt to portray Solomon as a financial, rather than religious, institution, PVA's brief contains several prominent quotations from Solomon's website. While these references were also included in PVA's trial court brief,

---

[2] PVA and Revenue were also separately served with notice.

3

there is no indication this material was placed into the administrative record before the Tax Board.

KRS[3] 49.250(1) provides for judicial review of any final order issued by Tax Board "in accordance with KRS Chapter 13B." Under 13B.150, judicial review of a final administrative order "shall be confined to the record, unless there is fraud or misconduct involving a party engaged in administration of this chapter." In other words, judicial review of an agency's decision is limited to "the administrative record already in existence, not some new record made initially in the reviewing court."[4] *Smith v. O'Dea*, 939 S.W.2d 353, 356 (Ky. App. 1997) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985)) (internal quotation omitted); *see also Sunrise Children's Servs., Inc. v. Kentucky Unemployment Ins. Comm'n*, 515 S.W.3d 186, 190 (Ky. App. 2016) ("Courts have 'no authority to consider evidence outside the record or to incorporate new proof into the record.'"). Further, citation to factual information in an appellate brief is simply not a proper substitute for the development of an evidentiary record before the original factfinder. *Wemyss v. Coleman*, 729 S.W.2d 174, 179-80 (Ky. 1987).

---

[3] Kentucky Revised Statutes.

[4] Because this Court's task in reviewing the record primarily concerns the evidence developed before the administrative tribunal, we further note PVA's repeated citations to the trial court's factual findings in its statement of the case, while perhaps technically compliant with our briefing rules, is not particularly helpful. We encourage parties to cite directly to the page of the administrative record where the underlying factual information is located.

4

Moreover, we decline to take judicial notice of this information, sua sponte. This Court has exercised great caution when considering the propriety of taking judicial notice of adjudicative facts on appeal. *Commonwealth, Cab. for Health & Fam. Servs. v. Ivy*, 353 S.W.3d 324, 335 (Ky. 2011). Indeed, the existence of "any doubt should be resolved in favor of a refusal" to take judicial notice. *Lampkins v. Commonwealth*, 701 S.W.3d 99, 114 (Ky. 2024) (quoting 2 *Wharton's Criminal Evidence* § 5:10 (15th ed.)).

While public records and other government documents which are available on the internet may be the proper subjects of judicial notice, we are not convinced that mission statements and other descriptive information contained on a private party's website necessarily exhibit the requisite degree of accuracy and indisputability demanded by KRE[5] 201. *Compare Fox v. Grayson*, 317 S.W.3d 1, 18 n.83 (Ky. 2010) (holding appellate court may properly consider, sua sponte, public records and government documents) *with Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3rd Cir. 2007) ("[C]ourts should be wary of finding judicially noticeable facts amongst all the fluff; private corporate websites, particularly when describing their own business, generally are not the sorts of 'sources whose accuracy cannot reasonably be questioned[.]'"). In addition, we are particularly reluctant to take judicial notice here because we cannot be assured the contents of Solomon's website have

---

[5] Kentucky Rules of Evidence.

5

remained unchanged throughout the extended years-long pendency of this litigation.

This Court recognizes the "standards for determining the indisputable accuracy of varying types of online sites and data are still evolving." Robert P. Mosteller, 2 *McCormick On Evid.* § 330 (9th ed. 2025). In the appropriate case, information contained on a party's website may be properly subject to judicial notice in accordance with the dictates of KRE 201. However, we decline to take judicial notice, sua sponte, under the present circumstances, and have disregarded the references to Solomon's website which were not included in the administrative record.

## II. FACTS AND PROCEDURAL HISTORY

Solomon is a Colorado nonprofit corporation organized exclusively to promote the religious purposes of Restoration Movement Christian Churches and Churches of Christ. The Restoration Movement concerns the ministries and beliefs of various independent, autonomous, and nondenominational Christian Churches.[6] Two Restoration Movement Churches comprise Solomon's membership: The Crossroads Christian Church of Grand Prairie, Texas, and Christ's Church of the Valley which is located in Peoria, Arizona.

---

[6] The specific religious character of the Restoration Movement is not at issue here. However, we refer the interested reader to the opinion of our predecessor Court in *Martin v. Kentucky Christian Conference*, 255 Ky. 322, 73 S.W.2d 849, 850-51 (1934), for a general discussion concerning the historical background and principles of the Restoration Movement.

6

Additionally, Solomon's bylaws require all members of its Board of Directors to be active members of Restoration Movement churches.

To further its goal of promoting the Restoration Movement, Solomon generates revenue through gifts, bequests, and the sale of securities, such as notes, bonds, or other indebtedness upon which interest is paid, to fund loans and provide financing to affiliated churches. This type of operation is commonly referred to as a "church extension fund,"[7] and having obtained such designation, Solomon is exempt from various regulations for the registration and sale of securities under federal and state law.[8] Additionally, Solomon's financial activities do not inure to the benefit of "its directors or other individuals" and, in the event of a dissolution, Solomon's assets will be distributed to its member Churches.

Solomon is also exempt from federal income taxation under Sections 501(c)(3) and 509(a)(2) of the Internal Revenue Code because it qualifies as a public charity which receives more than one-third of its support from gifts, grants, contributions, or membership fees and not more than one-third of

---

[7] The North American Securities Administrators Association, Inc. promulgated a statement of policy which defines a "church extension fund" as "A NOT-FOR-PROFIT ORGANIZATION affiliated or associated with a DENOMINATION, or a fund that is accounted for separately by a DENOMINATION organized as a NOT-FOR-PROFIT ORGANIZATION, that offers and sells NOTES primarily to provide funding for loans to various affiliated churches and related religious organizations of the DENOMINATION for the acquisition of property, construction or acquisition of buildings and other related capital expenditures or operating needs."

[8] *See*, *e.g.*, 15 United States Code Annotated (U.S.C.A.) § 77c(a)(4); § 78l(g)(2)(D); and § 80a-3(c)(10). Similarly, KRS 292.400 exempts religious organizations from various regulations governing the sale of securities contained in KRS 292.340 to 292.390.

support from gross investment income or other taxable sources. In addition, Solomon is not obligated to file a Form 990 or Form 990-EZ[9] with the Internal Revenue Service because it is considered as an "integrated auxiliary of a church" under Treasury Reg. Section 1.6033-2(h).[10] Solomon has further received property tax exemptions in California, Colorado, Idaho, Indiana, Michigan, and New Jersey.

This appeal centers on real property owned by Solomon which is located at 1200 Jefferson Street in Paducah, Kentucky. The property includes a traditional church building and two auxiliary buildings. On September 29, 2015, Solomon acquired the property from Four Rivers Covenant Church, a Kentucky-based church,[11] presumably as part of Solomon's gift-leaseback program.[12] Apparently, that same day, Solomon entered into a triple net

---

[9] Ordinarily, "[m]ost exempt organizations must file annual information returns, generally on Form 990 or 990-EZ . . . specifying receipts and expenditures and indicating their current financial status." Marilyn E. Phelan, *Rep. Nonprofit Org.* § 2:79 (2023).

[10] Treasury Reg. Section 1.6033-2(h)(1)(i)-(iii) generally defines an "integrated auxiliary of a church" as an organization which is: "[d]escribed both in [Internal Revenue Code] sections 501(c)(3) and 509(a) (1), (2), or (3)"; "[a]ffiliated with a church or a convention or association of churches"; and "[i]nternally supported."

[11] The record reflects that Four Rivers was formerly known as Pathfinder Ministries, which was based in Tennessee. Pathfinder Ministries acquired the property in 1998.

[12] The certificate of consideration on the deed between Solomon and Four Rivers states, "The grantor and grantee, being duly sworn, certify that the value of the property described above is $1,100,000.00, which includes a gift of $615,932.51 made by grantor to grantee and $484,067.49 being consideration paid by grantee to grantor for the transfer of the property." The record is unclear whether Four Rivers maintained any involvement with the property following the conveyance to Solomon.

lease[13] for the property with The Crossing, an Illinois-based church.[14] The lease required The Crossing to use the property "as a religious facility, i.e., Church, and for purposes related thereto." Approximately two years later, on July 31, 2017, The Crossing subleased a portion of the property to Restoration Church. The next month, The Crossing subleased a smaller portion of the property to Healing Projects. The subleases specify that Restoration Church and Healing Projects must also use the property as a church or for related purposes.

For the 2019 tax year, PVA assessed the property to have a value of $1.1 million. On November 5, 2018, Solomon applied for a tax exemption from the PVA under Section 170 of the Kentucky Constitution, claiming qualification as both an institution of purely public charity and an institution of religion. Concluding Solomon did not qualify as an institution of religion or an institution of purely public charity, PVA denied the requested exemption by

---

[13] The term "triple net lease" generally denotes a commercial lease whereby "the tenant is . . . responsible for expenses such as maintenance, insurance, real estate taxes, and utilities, in addition to its lease payments, but the title[] or label[] of . . . 'triple net lease,' . . . ha[s] no legal significance and [is] not decisive of the extent to which the parties intended to shift the expense burdens of various operating, repair and maintenance obligations from landlord to tenant." 49 Am. Jur. 2d *Landlord and Tenant* § 686 (2025) (footnote omitted). Section 8(a) of the lease agreement between Solomon and The Crossing provides in part, "[t]enant shall pay all Real Estate Taxes, if any" and further states, "[a]ny Real Estate Taxes for the first and last year of the Term shall be allocated between Landlord and Tenant, pro rata[.]" As a general matter, however, only property owners have standing to seek a property tax exemption. 84 C.J.S. *Taxation* § 388 (2024).

[14] The lease between Solomon and the Crossing is also dated September 29, 2015.

9

letter dated December 18, 2018. On June 19, 2019, the Board of Assessment, in consultation with Revenue, upheld the PVA's denial of the exemption.

Solomon appealed to the Tax Board which affirmed the denial of the exemption on different grounds in a final order entered on February 16, 2021. The Tax Board initially determined Solomon did not qualify as a purely public charity under Kentucky law. Contrary to the Board of Assessment, however, the Tax Board concluded Solomon was an institution of religion based on the contents of its articles of incorporation and its character as a church extension fund. Nevertheless, the Tax Board further concluded Solomon was not entitled to the exemption because it did not own and occupy the property at issue.

Following the adverse decision of the Tax Board, Solomon filed a petition for judicial review. PVA did not file an answer. However, both parties briefed the legal issues on the merits and otherwise made their respective positions known to the trial court including PVA's claim that Solomon did not qualify as an institution of religion. However, because PVA had not filed a cross-petition for judicial review from the Tax Board, the trial court determined its review was limited to Solomon's claims of error and PVA's responsive arguments.

On October 12, 2021, the trial court entered an opinion and order reversing the denial of the exemption by the Tax Board. The trial court agreed with the Tax Board that Solomon does not constitute an institution of purely public charity. However, while the trial court upheld the finding of the Tax Board that Solomon qualified as an institution of religion, it disagreed with the Tax Board's conclusion that Solomon itself must own and occupy the property.

10

Instead, the trial court interpreted Section 170 to allow a tax exemption where one institution of religion owns property which is occupied by a different institution of religion.

PVA and Revenue separately appealed from the final opinion and order of the trial court.[15] The Court of Appeals affirmed. Specifically, the Court of Appeals held Solomon did not qualify as a purely public charity.[16] Contrary to the trial court, the Court of Appeals determined the issue of whether Solomon qualified as an institution of religion under Section 170 was properly preserved for review. Ultimately, however, the Court of Appeals agreed with the trial court that Solomon was entitled to the exemption. We granted discretionary review and heard oral argument.

### III. LAW AND ANALYSIS

#### A. The interpretation of Section 170 is properly before this Court

Before turning to the merits of this appeal, we must resolve the parties' dispute whether the issue concerning the interpretation of Section 170 was properly preserved for our review.[17] Solomon contends PVA's failure to file an

---

[15] After the entry of its opinion and order, but before finality, the trial court granted Revenue's motion to intervene. Apparently, Revenue mistakenly believed the present matter had been held in abeyance pending the outcome of similar litigation in another court.

[16] Because Solomon has not presented any further argument concerning its status as purely public charity in its briefs before this Court, we deemed the issue to have been abandoned. *Halvorsen v. Commonwealth*, 671 S.W.3d 68, 74 (Ky. 2023).

[17] We note PVA's opening brief does not comply with RAP 32(A)(4), which requires an appellant's opening brief to "contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." This rule applies equally to briefs before this Court and the Court of Appeals and we have repeatedly admonished litigants that "[t]he failure of an appellant's brief to conform to the appellate rules

11

answer to its petition for judicial review in the trial court forecloses further consideration of this issue because CR[18] 8.04 generally[19] deems "[a]verments in a pleading to which a responsive pleading is required [to be] admitted when not denied in the responsive pleading[.]" In other words, the argument is that PVA's failure to file an answer equates to an admission that Solomon qualifies as an institution of religion under Section 170. Solomon further asserts PVA's failure to preserve this issue must also be imputed to Revenue because Revenue did not intervene until after the trial court entered a final order.

Under CR 1(2), the Civil Rules "govern procedure and practice in all actions of a civil nature in the Court of Justice except for special statutory proceedings, in which the procedural requirements of the statute shall prevail over any inconsistent procedures set forth in the Rules[.]" In the context of judicial review from an administrative decision, "[t]he civil rules do not apply . . . until after the appeal has been perfected." *Bd. of Adjustments of City of Richmond v. Flood*, 581 S.W.2d 1, 2 (Ky. 1978). Because an administrative appeal is considered an original action and not a true appeal, we have held "the procedural steps required to 'take' an appeal from an administrative agency

---

justifies the striking of the brief under Kentucky Rules of Appellate Procedure ("RAP") 31(H)(1)." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 310 (Ky. 2023). For its part, Revenue's brief contains the required statement of preservation. Our review of the record indicates PVA and Revenue clearly raised this issue before the trial court and the Court of Appeals. Therefore, in the interest of justice and the avoidance of inconsistent judgments, we decline to impose any sanction for the deficiencies in PVA's brief.

[18] Kentucky Rules of Civil Procedure.

[19] CR 8.04 contains three exceptions which are not applicable here.

action are precisely the same steps required to commence any other original action in the circuit court." *Isaacs v. Caldwell*, 530 S.W.3d 449, 454 (Ky. 2017). Thus, Kentucky courts have long required parties to answer a petition for judicial review from an administrative decision. *Carnahan v. Yocom*, 526 S.W.2d 301 (Ky. 1975); *see also* David V. Kramer, 6 Ky. Prac. R. Civ. Proc. Ann. Rule 7.01 n.6 (2024) ("No reason appears why the same principle [as stated in *Carnahan*] would not apply to appeals from the decisions of other administrative agencies.").

Revenue maintains, however, that KRS 13B.140 does not require the filing of an answer and cites *Western Coca-Cola Bottling Co., Inc. v. Runyon*, 410 S.W.3d 113, 116 (Ky. 2013), and *Anderson v. Cabinet for Health & Fam. Servs.*, 643 S.W.3d 109, 114 (Ky. App. 2022), in support of its position.[20] These cases are distinguishable, however, and thus Revenue's reliance on them is misplaced.

Notably, *Runyon* did not involve an administrative appeal under KRS 13B.140. Instead, in *Runyon*, we examined the detailed procedures for judicial review under KRS 341.450 which constitute "a special statutory proceeding." 410 S.W.3d at 116. "A 'special statutory proceeding' is one that is 'complete within itself having each procedural detail prescribed.'" *McCann v. Sullivan Univ. Sys., Inc.*, 528 S.W.3d 331, 334 (Ky. 2017) (quoting *C.C. v. Cabinet for Health & Fam. Servs.*, 330 S.W.3d 83, 87 (Ky. 2011)). Because the specific

---

[20] PVA did not respond to Solomon's arguments regarding preservation.

13

provisions relative to responsive pleadings under KRS 341.450(2) "are inconsistent with the . . . requirements of CR 7.01[,]" we held each named defendant was not required to file an answer. *Runyon*, 410 S.W.3d at 116.

We perceive no such inconsistency, however, between KRS 13B.140 and CR 7.01. Unlike KRS 341.450(2), KRS 13B.140 is completely silent on the question of whether a responsive pleading is required, and mere silence does not amount to inconsistency.

Similarly, the decision of the Court of Appeals in *Anderson* has no bearing on the present question because that matter did not involve an administrative appeal under KRS 13B.140. 643 S.W.3d at 112-13. Instead, *Anderson* involved a petition for immediate custody of a child under KRS 620.110. *Id.* Moreover, a petition for immediate custody under KRS 620.110 is an original action in the nature of a writ proceeding where the circuit court is sitting as an appellate court. *Id.* (citing CR 76.36(2) [now RAP 60(D)]); *see also* KRS 620.110 ("During the pendency of the petition for immediate entitlement the orders of the District Court shall remain in effect."). Original actions in an appellate court are governed by different procedural rules than original actions filed in a trial court. *Id.* Again, under KRS 23A.010(4), "an appeal to the circuit court from an order of an administrative agency is not a true appeal but rather an original action[,]" which is "commenced by (1) the filing of a complaint (petition), and (2) the issuance of summons (or warning order) in good faith." *Commonwealth, Transp. Cab., Dept. of Highways v. City of Campbellsville*, 740 S.W.2d 162, 164 (Ky. App. 1987).

14

PVA's failure to file a responsive pleading, however, does not preclude our review of its argument concerning the proper interpretation of Section 170, notwithstanding the provisions of CR 8.04. Our review of the record indicates that prior to the expiration of the deadline for the filing of PVA's answer, Solomon and PVA filed a joint motion seeking expedited review in the Court of Appeals.[21] The joint motion specifically references PVA's denial of Solomon's claims that the "subject property is exempt from property tax under Section 170 of the Kentucky Constitution under the institutions of religion of the purely public charity exemption" and further explicitly states, "[i]n the interest of judicial efficiency with **Plaintiff preserving the issues raised in its Petition and Defendants denying same**, the Parties hereto respectfully seek to move this appeal forward to the Court of Appeals[.]" (Emphasis added).

Plainly, Solomon had timely notice of PVA's position on the merits and we perceive the joint motion along with Solomon's failure to raise any subsequent objections in the trial court constitutes an unequivocal waiver of any issues regarding PVA's failure to file an answer.[22] *See* CR 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of

---

[21] The trial court properly denied the parties' joint motion in an order entered on September 7, 2021, concluding KRS Chapter 13B contains "no provision for this court to elect not to rule."

[22] In its reply brief before the trial court, Solomon argued PVA was precluded from raising any issues concerning the scope of Section 170 because it did not file a cross-petition for judicial review. Although the trial court accepted Solomon's argument in this regard, the Court of Appeals properly rejected it on the ground that PVA was not aggrieved by the decision of the Tax Board. By failing to raise this issue in its briefs to this Court, we deem the argument to have been abandoned. *Halvorsen*, 671 S.W.3d at 74.

15

the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *Impellizeri v. Urban Renewal & Cmty. Dev. Agency*, 429 S.W.2d 41, 43 (Ky. 1968) ("No contention was made in the trial court by appellants that appellee made a 'judicial admission' in its answer."); Kramer, 6 *Ky. Prac. R. Civ. Proc. Ann.* Rule 12.01 at cmt. 5 ("If a plaintiff fails to object to the late filing of an answer, he or she waives the objection and cannot complain subsequently that the pleading was untimely."). Thus, we conclude the issue concerning the proper interpretation of Section 170 is properly before us.

This Court acknowledges the stakes and importance of the present matter as well as counsel's duty of zealous representation. However, PVA's failure to comply with our briefing rules coupled with Solomon's meritless procedural wrangling have needlessly belabored this opinion. We remind the parties and all litigants that our procedural rules are meant to ensure the fair, orderly, and efficient deployment of judicial resources to serve the administration of justice. *Gasaway*, 671 S.W.3d at 314. Indeed, these rules exist to facilitate "the determination of disputes on their merits rather than on the basis of procedural gamesmanship or tactical advantage." Kramer, 6 *Ky. Prac. R. Civ. Proc. Ann.* Rule 16 at cmt.2; *see also Hashmi v. Kelly*, 379 S.W.3d 108, 113 (Ky. 2012); *Stieritz v. Commonwealth*, 671 S.W.3d 353, 367 (Ky. 2023).

### B. Solomon is not an institution of religion under Section 170

PVA and Revenue argue Solomon does not qualify as an institution of religion within the meaning of Section 170. We agree.

16

The outcome of this appeal depends on the meaning of the phrase "real property owned and occupied by . . . institutions of religion" under Section 170 which is a pure question of constitutional interpretation subject to de novo review. *Kentucky CATV Ass'n, Inc. v. City of Florence*, 520 S.W.3d 355, 359 (Ky. 2017) (citing *Greene v. Commonwealth*, 349 S.W.3d 892, 898 (Ky. 2011)); *Louisville & Jefferson Cnty. Metro. Sewer Dist. v. Bischoff*, 248 S.W.3d 533, 535 (Ky. 2007). Under the de novo standard, we owe no deference to the legal conclusions of the lower courts. *Bluegrass Trust v. Lexington-Fayette Urban Cnty. Gov't*, 701 S.W.3d 196, 2024 (Ky. 2024).

The cardinal rule of constitutional construction "is to ascertain the intention of the framers and the people in adopting it." *Meredith v. Kauffman*, 293 Ky. 395, 169 S.W.2d 37, 38 (1943). Unless the provision at issue is ambiguous or employs legal terms of art, we must "give words their plain and ordinary meanings." *Freeman v. St. Andrew Orthodox Church, Inc.*, 294 S.W.3d 425, 428 (Ky. 2009). While dictionaries and other reference works may certainly assist a court in determining the plain and ordinary meaning of a constitutional provision, we must also account for the legal context and remain mindful of the "equally well recognized rule of construction that different sections of a Constitution, including amendments, are to be construed as a whole in an effort to harmonize the various provisions and not produce conflict between them." *Shamburger v. Duncan*, 253 S.W.2d 388, 391 (Ky. 1952). Further, a reviewing court must

> look to the history of the times and the state of existing things to ascertain the intention of the framers of the Constitution and the people adopting it, and a practical interpretation will be given to the end that the plainly manifested purpose of those who created the Constitution, or its amendments, may be carried out.

*Keck v. Manning*, 313 Ky. 433, 231 S.W.2d 604, 607 (1950).

At common law, church property did not receive an "automatic and unrestricted tax exemption[.]" W. Cole Durham & Robert Smith, 4 *Religious Organizations and the Law* § 33:3 (2d. 2023). Similarly, in Kentucky, the law is well-established that "no property shall be exempt from taxation except as provided in this Constitution[.]" KY. CONST. § 3. Courts and other authorities, therefore, cannot presume, assume, or imply any relinquishment or waiver of the sovereign right of taxation. *Vogt v. City of Louisville*, 173 Ky. 119, 190 S.W. 695 (1917). Any party claiming entitlement to a tax exemption bears the burden to affirmatively demonstrate the claimed exception is authorized by law. *Benevolent Ass'n of Elks v. Wintersmith*, 204 Ky. 20, 263 S.W. 670, 672 (1924). Tax exemptions must be strictly construed, and any doubts are to be resolved in favor of the taxing authority. *Id.* In other words, "it is only where the exemption is shown to be granted in terms clear and unequivocal that the right of exemption can be maintained." *Id.* (quoting *Frederick Elec. Light & Power Co. v. City of Frederick City*, 84 Md. 599, 36 A. 362, 364 (1897)). The law requires courts to apply this narrow approach because "the exemption granted to one person places an additional burden upon others." *Kesselring v. Bonnycastle Club*, 299 Ky. 585, 186 S.W.2d 402, 403 (1945).

18

With the foregoing standards in mind, we turn to Section 170 which

provides in pertinent part:

> There shall be exempt from taxation . . . real property owned and occupied by, and personal property both tangible and intangible owned by, institutions of religion; institutions of purely public charity, and institutions of education not used or employed for gain by any person or corporation, and the income of which is devoted solely to the cause of education. . . . The real property may be held by legal or equitable title, by the entireties, jointly, in common, as a condominium, or indirectly by the stock ownership or membership representing the owner's or member's proprietary interest in a corporation owning a fee or a leasehold initially in excess of ninety-eight years. The exemptions shall apply only to the value of the real property assessable to the owner or, in case of ownership through stock or membership in a corporation, the value of the proportion which his interest in the corporation bears to the assessed value of the property.

Prior to a 1990 amendment, Section 170 did not refer to "institutions of

religion" and instead exempted:

> [P]laces actually used for religious worship, with the grounds attached thereto and used and appurtenant to the house of worship, not exceeding one-half acre in cities or towns, and not exceeding two acres in the country; . . . all parsonages or residences owned by any religious society, and occupied as a home, and for no other purpose, by the minister of any religion, with not exceeding one-half acre of ground in towns and cities and two acres of ground in the country appurtenant thereto.

Under the former law, our predecessor Court construed this specific exemption

to have a "limited area of application" which was "in nowise supported by the

policy underlying the more liberal exemption accorded charitable and

educational institutions." *City of Ashland v. Calvary Protestant Episcopal*

*Church of Ashland*, 278 S.W.2d 708, 710 (Ky. 1955).

By employing the phrase "institutions of religion" in conjunction with the

removal of usage limitations pertaining to actual places of worship and

19

parsonages, we conclude the current version of Section 170 was clearly intended to place institutions of religion on an equal plane relative to institutions of purely public charity and education as a matter of law and public policy. *See Caudel v. Prewitt*, 296 Ky. 848, 178 S.W.2d 22, 26 (1944) (applying interpretative rule that the use of similar language in constitutional provisions should receive a consistent interpretation). However, while the broadening of the religious exemption was undoubtably significant, this dynamic alone does not illuminate the meaning of the phrase "institutions of religion." Although this aspect of Section 170 presents a matter of first impression, we do not write on an entirely clean slate and take guidance from the general principles established by our rules of construction and prior caselaw.

Under Section 170, entitlement to a tax exemption depends on both the character of the owner and the use of the property. *Mordecai F. Ham Evangelistic Ass'n v. Matthews*, 300 Ky. 402, 189 S.W.2d 524, 526 (1945); *Kesselring*, 186 S.W.2d at 403-04. To ascertain the religious character of a property owner for tax exemption purposes, the *Ham* decision instructs that courts must look beyond legalistic forms and superficial labels "to see the beneficial or real ownership, *its nature and functions*." 189 S.W.2d at 527 (emphasis added).

This searching analysis is akin to piercing the corporate veil which must necessarily account for the totality of relevant circumstances on a case-by-case basis. *Id.* To be clear, the undertaking of such a fact-intensive examination

20

does not impute any wrongdoing, dishonesty, or malfeasance on the part of the taxpayer.  *Id.*  Instead, courts and tax authorities must conduct a rigorous inquiry to satisfy the standard of strict compliance demanded by our precedents.  *Wintersmith,* 263 S.W. at 672.

Otherwise, any person or enterprise could obtain a tax exemption through the artful drafting of legal documents and the mere self-declaration of a religious purpose.  *Ham,* 189 S.W.2d at 528.  For tax exemption purposes, "[i]t is not enough that a corporation believes and declares itself to be" an institution of religion.  *American Guidance Foundation, Inc. v. United States,* 490 F.Supp. 304, 307 (D.D.C. 1980); *see also* 84 C.J.S. *Taxation* § 347 (2024) ("It cannot be sufficient for a group simply to label itself as a religion in order to enjoy tax-exempt status.").  Thus, while an organization's articles of incorporation, by-laws, and tax status under foreign law[23] are relevant considerations, they are not dispositive of entitlement to an exemption under Section 170.

Kentucky law has employed a similar functional approach to determine the character of institutions of purely public charity and education.  To maintain a consistent judicial voice, we should thus construe "institutions of

---

[23] Considering the wide variety of constitutional and statutory tax exemptions, "[i]t is important to bear in mind that cases reaching different conclusions are not necessarily inconsistent or conflicting, inasmuch as they may involve interpretation of differently phrased or worded enactments."  F. P. Renner, Annotation, *Construction of Exemption of Religious Body or Society from Taxation or Special Assessment,* 168 A.L.R. 1222 § III(a) (1947).

religion" in the same manner as "charity" and "education" have previously been interpreted relative to the term "institution." *See Caudel*, 178 S.W.2d at 26.

Our predecessor Court defined an "institution" for the purpose of Section 170 as "that which is set up, provided, ordained, established, or set apart for a particular end, especially of a public character or affecting the community." *Commonwealth v. Gray's Trustee*, 115 Ky. 665, 74 S.W. 702 (1903). Applying this definition to an institution of purely public charity, Kentucky law has long required that "the institution *must itself be* a charity[.]" *Iroquois Post No. 229 v. City of Louisville*, 309 S.W.2d 353, 355 (Ky. 1958) (emphasis added); *Banahan v. Presbyterian Housing Corp.*, 553 S.W.2d 48, 51 (Ky. 1977); *Hancock v. Prestonsburg Indus. Corp.*, 365 S.W.3d 199, 201 (Ky. 2012). In *Hancock*, we specifically focused on the nature of the institution's activities and distinguished "between a charitable institution and an organization which has incidental charitable benefits[.]" 365 S.W.3d at 202.

Similarly, in explaining the nature of "institutions of education," our predecessor Court observed:

> The framers of the constitution evidently had in mind institutions of education, such as colleges and schools, which are organized for the purpose of affording those desiring to acquire an education an opportunity to do so. They meant *institutions that were officered in the usual way*, and employing corps of professors or teachers to furnish instruction to the students in attendance.

*Bosworth v. Kentucky Chautauqua Assembly*, 112 Ky. 115, 65 S.W. 602, 603 (1901) (emphasis added). Additionally, Kentucky caselaw limited the meaning of "institution of education" to the ordinary sense, meaning "a place where

22

systematic instruction in any or all of the useful branches of learning is given by methods common to schools and institutions of learning." *Kesselring*, 186 S.W.2d at 404.

In *Kesselring*, our predecessor Court distinguished this common understanding of "institution of education" from "schools for teaching dancing, riding and other special accomplishments [which] are not schools or institutions of education in the ordinary sense." *Id.* Moreover, the *Kesselring* Court differentiated between institutions that provide a direct educational benefit from organizations whose educational benefits are merely incidental to other non-exempt activities. *Id.* at 404. In other words, the requirement is that an institution "must itself be" a school, university, or other scholastic establishment which functions in the usual or ordinary manner. *Bosworth*, 65 S.W. at 603; *see also Iroquois Post*, 309 S.W.2d at 355.

Taking the logic of *Iroquois Post* and *Bosworth* as a framework, we must next consider what it means for an institution to "itself be" a religion. Fortunately, we need not formulate a global, comprehensive definition of religion and may properly limit this opinion to the specific context of tax exemptions under Section 170. *Freeman*, 294 S.W.3d at 429 ("[O]ur ruling here today in defining this term is restricted to 'institutions of religion' . . . under Section 170 of our state Constitution."). Moreover, the question of whether an entity satisfies the requirements for tax-exempt status under a constitutional provision or statute is distinct from the question of whether a particular activity constitutes religious expression under the First Amendment.

*American Guidance,* 490 F.Supp. at 306 (D.D.C. 1980). Indeed, "[i]t is important to note . . . that an examination of what constitutes a 'church' for purposes of applicable provisions of the tax code does not require consideration of whether an organization's beliefs and practices represent a 'religion' within the purview of the First Amendment to the Constitution." *Church of Eternal Liberty Life & Liberty, Inc. v. C.I.R.,* 86 T.C. 916, 923-24 (1986) (citing *Chapman v. Commissioner,* 48 T.C. 358, 361 (1967)). Inevitably, however, "[t]he means by which an avowedly religious purpose is accomplished separates" an institution of religion under Section 170 "from other forms of religious enterprise." *American Guidance,* 490 F.Supp. at 306.

Notably, our predecessor Court determined Section 170 exists *in pari materia* with Sections 5 and 189 of the Kentucky Constitution. *Calvary Protestant,* 278 S.W.2d at 710; *Commonwealth v. Thomas,* 119 Ky. 208, 83 S.W. 572, 573 (1904). Laws *in pari materia* "are to be considered together, as if they were one law." *Greer v. City of Covington,* 83 Ky. 410, 2 S.W. 323, 325 (1885). Indeed, "[c]onstitutions, like statutes, are to be construed so that all parts of them may stand together[.]"[24] *Crick v. Rash,* 190 Ky. 820, 229 S.W. 63, 71 (1921).

---

[24] While the term "*in pari materia*" derives from the canon of construction governing related statutes, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 253 (2012), this Court has consistently applied the same principle to matters of constitutional interpretation. *Williams v. Wilson,* 972 S.W.2d 260, 267 (Ky. 1998) ("Sections 14, 54 and 241 have been interpreted to work in tandem[.]"); *Bd. of Ed. of Spencer Cnty. v. Spencer Cnty., Levee, Flood Control, & Drainage Dist. No. 1,* 313 Ky. 8, 230 S.W.2d 81, 83 (1950) ("[T]he provisions of Sections 180 and 184 of the Constitution are considered together, as they must be[.]"); *City of Winchester v. Nelson,* 175 Ky. 63, 193 S.W. 1040, 1042 (1917) ("[I]t has been

Section 5 of the Kentucky Constitution sets forth the right of religious freedom and forbids the granting of governmental preferences upon

> any *religious sect, society or denomination*; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching.  No human authority shall, in any case whatever, control or interfere with the rights of conscience.

(Emphasis added).  Similarly, Section 189 prohibits the appropriation of governmental funding for the support of "any church, sectarian or denominational school."  Our predecessor Court read these provisions together with Section 170 as a "comment, which borders on precaution . . . that serves to guide us when dealing with the taxation of *property owned by a church*."[25] *Calvary Protestant*, 278 S.W.2d at 710 (emphasis added).  Moreover, legal questions involving the ownership of church property "must take into consideration the organization and government of *the church*[.]"[26]  *Thomas v. Lewis*, 224 Ky. 307, 6 S.W.2d 255, 257 (1928) (emphasis added).

---

frequently held by this court that sections 157 and 158 must be considered together[.]").

[25] We further observe the Supreme Court of the United States has definitively held the granting of a property tax exemption does not constitute the unconstitutional establishment of religion.  *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 672 (1970) ("The legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility.").

[26] The organization and government of a religious body is commonly referred to as an "ecclesiastical polity" and denotes the form of religious authority and

25

Additionally, in interpreting Section 170, Kentucky jurisprudence has specifically construed the term "religious society" interchangeably with the word "church," meaning "some group organized and maintained for the support of public worship[.]" *Ham*, 189 S.W.2d at 527. Moreover, under Kentucky law, the term "religious society"

> was commonly used in the generally accepted sense, and in accordance with designations or definitions given in the dictionaries and elsewhere as being an association or body of communicants or a church usually meeting in some stated place for worship or for instruction, or organized for the accomplishment of religious purposes such as instruction or dissemination of some tenet or particular faith or otherwise furthering its teachings.

*Id.* The *Ham* Court further specified, however, that the sole purpose of a religious society need not be limited to "public worship[.]" *Id.* at 528 (citation omitted). Indeed, "the term 'religious society' is broader than a local church or congregation and embraces any board or agency of a general church or parent body, such, for example, as the Roman Catholic Church or the Methodist Church." *Id.* Additionally, businesses and other income producing activities "conducted *by a general or parent church*" whose revenue was utilized solely to advance religious objectives such as "a publishing house printing and

---

government in matters "both ecclesiastical and temporal." *Clay v. Crawford*, 298 Ky. 654, 183 S.W.2d 797, 800 (1944). American law generally recognizes three types of religious government; (1) hierarchical, (2) congregational or independent; and (3) synodal or presbyterian. *Watson v. Jones*, 80 U.S. 679, 722-23 (1871); *Thomas*, 6 S.W.2d at 257. While Kentucky decisions involving the subject of ecclesiastical polity have frequently arisen in the context of Christian churches, "[v]ariations upon the three models are found throughout the religious world, with most of the non-Christian religions following some type of congregational model." Durham & Smith, 1 *Religious Organizations and the Law*, at § 8:6.

26

distributing religious books" may properly fall within the exemption. *Id.* (emphasis added) (citation omitted).

Importantly, the *Ham* Court further distinguished a religious society from a religious corporation.[27] *Id.* at 527. The Court explained:

> Distinction may be drawn between a religious corporation, which is but an inanimate person, a legal entity possessing none other than temporal powers, and a church or body of communicants or group gathered in a common membership for mutual support and edification in piety, worship and religious observances, or a society of individuals united for religious purposes at a definite place or places.

*Id.* A religious society, within the meaning of the Kentucky Constitution, may be further contrasted with various activities of religious fellowship. *Id.* at 528 ("The many contributors and the audiences may be regarded as a kind of fellowship but not as a 'society' within the meaning of the Constitution."). The salient characteristics of a religious society are "communion," "unity," and "society." *Id.* "The term society itself implies a getting together of its members, although it is true persons may worship God or even receive religious instructions without getting together." *Id.* (internal quotations omitted).

Similarly, the Supreme Court of Ohio emphasized the associational aspect of a religious society and described the traditional legal understanding as follows:

> Religious societies of sects or denominations are founded for the purpose of uniting together in public religious worship and

---

[27] We further note the term "religious corporation" strictly denotes "an artificial construction of the state, which is designed to provide the *congregants* with an orderly procedural framework in order for them to freely exercise their religion." 1A *Fletcher Cyc. Corp.* § 80 (2024) (emphasis added).

religious services, according to the customary, habitual, or systematic forms of the particular sect or denomination, and in accordance with, and to promote and enforce their common faith and belief.

. . .

It is equally unreasonable to suppose that a denomination or sect of religious persons would form themselves into a religious society, without any intention *to meet together as such,* to worship according to that faith, and without any stated or customary religious public services. It would be a society without association; a society in name only, but not in fact.

*State v. Township 9,* 7 Ohio St. 58, 64-65 (1857) (emphasis added). By contrast, "'[r]eligiously affiliated' institutions usually provide services on a professional level" and "do not proselytize, participate in worship, or promote religious education." Durham & Smith, 3 *Religious Organizations and the Law,* at § 26:6. The Maryland Court of Appeals further illustrated the longstanding distinction between a religious society and a religiously affiliated organization as follows:

As to the Society for the Relief of the Poor of the Methodist Episcopal Church of Baltimore City Station, its object being to secure and afford pecuniary aid and assistance to the indigent and poor members of the church attached to that station, **it was not an ecclesiastical society at all, but rather a benevolent or charitable one**, **whose work was closely connected with the work of the church, but essentially distinct therefrom**, and therefore, while affiliated with, and auxiliary to, the church organization, this society was certainly no integral part thereof.

*Trustees of Methodist Episcopal Church of Baltimore City v. Asbury Sunday-School Society,* 109 Md. 670, 72 A. 199, 202 (1909) (emphasis added).

Further, the connection between Section 170 and church ownership resonates with the general historical character of religious tax exemptions. *See*

28

Carl Zollmann,[28] *American Civil Church Law* 237 (1917).  "The constitutional provisions or statutory enactments which exempt educational and charitable associations . . . . generally add an exemption, more or less qualified, of the property owned or used by religious bodies."  *Id.*  Moreover, "when the constitutions which are silent on this matter were adopted it was and remained a recognized practice to exempt *church property* from taxation."  *Id.* at 245 (emphasis added).  This longstanding practice of exempting "church bodies" from taxation was largely premised on "[t]he moral influence exerted by these bodies over their adherents, like the charity administered and the education imparted by private charitable and educational institutions[.]"  *Id.* at 238.  Indeed, the overarching purpose of codifying the customary religious exemptions was "to foster religious societies" and "justify a practice as old as the oldest of the thirteen colonies."  *Id.* at 239, 248.

Importantly, we are further convinced contemporary usage at the time Section 170 was amended in 1990 maintained the traditional understanding that, for tax exemption purposes, the phrase "institution of religion" refers to a church, religious sect, society, or denomination.  For example, when *Freeman* was rendered in 2009, this Court continued to "recognize that churches are unique" and attributed the ownership of "churches, mosques, tabernacles,

---

[28] Professor Zollmann's work has "often [been] incorrectly identified in print as 'Zollman[.]'"  Robert M. Jarvis, *Carl Zollmann: Aviation Law Casebook Pioneer*, 73 J. Air L. & Com. 319, 322 (2008).

temples, and the like" to "institutions of religion."[29]  294 S.W.3d at 429 (emphasis added).  Moreover, because the framers of the 1990 Amendment to Section 170 deliberately employed the same phrase "institutions of" to refer to religion, purely public charity, and education, we must presume and reiterate each of these phrases was intended to receive a similar legal and grammatical interpretation.  *See Caudel*, 178 S.W.2d at 26.

Against this constitutional and legal background, we thus interpret "institutions of religion" under Section 170 to mean any church, religious sect, society, or denomination.  While the 1990 amendment to Section 170 clearly removed the specific usage and acreage limitations pertaining to houses of worship and parsonages, we cannot conclude the amendment expanded the scope of the ownership requirement to include institutions of a character beyond the parameters established by prior Kentucky law.

Applying this standard to the present appeal, we cannot conclude Solomon constitutes an institution of religion under Section 170.  Although Solomon's stated purpose is to advance the religious objectives of its Members and the Restoration Movement in general, Solomon is not, itself, a church, religious sect, society, or denomination, as those terms have been traditionally understood under Kentucky law.

---

[29] While the character of ownership for the purpose of Section 170 was not at issue in *Freeman*, we are persuaded by its general observations on this subject.  Dicta may be "persuasive or entitled to respect" according to its reasoning and applicability and where "it was intended to lay down a controlling principle."  *Cawood v. Hensley*, 247 S.W.2d 27, 29 (Ky. 1952).

While Solomon may support and promote religion through the funding of loans, leasing of property, and issuance of debt securities, we perceive the nature of these contributions to constitute "a kind of fellowship" as opposed to a community of individuals organized and associated, *as such*, "for worship or for instruction, or organized for the accomplishment of religious purposes such as instruction or dissemination of some tenet or particular faith or otherwise furthering its teachings." *Ham*, 189 S.W.2d at 527. In other words, we fail to discern the type of associational aspects which our precedents have recognized to be consistent with those of a church or religious society. *Id.*

Additionally, we cannot conclude Solomon constitutes a board, agency, or other nonprofit income-producing activity "conducted by a general or parent church." *Id.* at 528. The *Ham* Court based this expansive conception of a religious society on Judge Cooley's classic treatise on taxation, which, in turn, relied upon the decision of the Supreme Court of Tennessee in *Book Agents of Methodist Episcopal Church, South v. Hinton*, 92 Tenn. 188, 21 S.W. 321 (1893). *Id.*; Thomas M. Cooley; Clark A. Nichols, *Law of Taxation* § 742 n.77 (4th ed. 1924).

In *Methodist Episcopal*, the Tennessee Court determined a separately incorporated publishing house constituted a "religious and charitable institution" because the "corporation was created as an arm or agency of the Methodist Church[.]" 21 S.W. at 323. To support this determination, the Court took particular note of language establishing direct control by the church over the corporation. *Id.* at 322. Specifically, the corporate charter provided

31

the publishing house "shall 'now, and at all times hereafter,' be under the control of the Methodist Episcopal Church, South, according to the laws and usages of the same, as contained in their present or any future edition of their Discipline." *Id.* Additionally, the Court noted other internal church documents authorizing direct church oversight and involvement with the policies and activities of the corporation. *Id.*

Upon review of the present record, we do not perceive similar evidence of church control over Solomon. Indeed, the mere involvement, membership, or participation of a church or association of churches in the creation of a nonprofit corporation, without more, does not establish a relationship of agency or control. *Hope Lutheran Church v. Chellew*, 460 N.E.2d 1244, 1248-49 (Ind. Ct. App. 1984). Similarly, a finding of church agency or control does not necessarily follow from a commonality of religious belief amongst a corporate board of directors. *Id.* at 1248; *see also St. Catherine's Church Corp. of Riverside v. Technical Planning Associates, Inc.*, 520 A.2d 1298, 1300 (Conn. App. 1987).

Application of the foregoing legal authority to Solomon's independent corporate structure controverts any claim to existence as a religious society. Pursuant to its by-laws, Solomon, as a corporate entity, may appoint "at least five (5) and not more than eleven (11) persons" to serve on its board of directors, while the two member churches may each appoint one additional director to serve on the board. Thus, representative voting directors appointed by the two member Churches can never comprise a majority of Solomon's

32

board membership, thereby discounting any claim by Solomon that it exists as an agency or under the control of any religious body.

In other legal contexts, courts have determined church control of an organization simply entails the ability of the church to appoint the majority of directors, trustees, or officers. *See Lown v. Cont'l Cas. Co.*, 238 F.3d 543, 547 (4th Cir. 2001) ("An organization is controlled by a church when, for example, a religious institution appoints a majority of the organization's officers or directors."). We perceive this analysis to be equally applicable here. "[O]nce incorporated," Solomon "became a distinct and autonomous entity, one controlled by its board of directors and clearly distinguishable from the churches." *Hope Lutheran*, 460 N.E.2d at 1248. Stated differently, Solomon "alone was the agency" here. *Id.* at 1249.[30]

In addition to its non-church governing structure, Solomon's by-laws provide further evidence the corporation is neither an agent of nor controlled by any church, group of churches, or other religious entity. First, the corporate by-laws task Solomon's board of directors, not its member churches or their leadership, with "establishing policies to ensure the Corporation remains sound in administration and program." Second, they provide that "the

---

[30] Neither can Solomon transform itself from into an institution of religion by merely pointing to its church-centered client base. Patron churches that borrow funds or lease premises from Solomon are thereby subordinated and beholden to the corporation, exerting no control or authority over the lender or lessor. Further, non-member churches generally act as independent congregations, established with distinctive legal forms and governmental structures. For these reasons, a religious client base, alone, cannot establish Solomon as an institution of religion. *See Thomas*, 6 S.W.2d at 257.

33

business and property of the Corporation shall be managed and controlled by" the board of directors and that "all of the corporate powers . . . are hereby vested in and shall be exercised by the Board of Directors."[31]  And third, they grant Solomon's board of directors authority to empower its officers and agents to enter contracts "in the name of and on behalf of the Corporation."  Here, Solomon's activities relative to its ownership and leasing of the McCracken County property resulted from its own direction, and from actions taken on its own behalf, as opposed to a matter of its member Churches' agency, conduct, or control.

Based on the foregoing, we hold, while Solomon's motivations may arguably be laudable, benevolent, and religiously motivated or affiliated, as an institution, Solomon is not itself a church, religious sect, society, or denomination for the purpose of the property tax exemption under Section 170. Kentucky law disfavors tax exemptions and this Court is duty bound to construe such exemptions strictly, "with all doubts resolved against the exemption's application[.]"  *Popplewell's Alligator Dock No. 1., Inc. v. Revenue Cabinet*, 133 S.W.3d 456, 461 (Ky. 2004).

Further, we conclude the recent decision of the Supreme Court of the United States in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Com'n*, 605 U.S. 238 (2025), does not compel a different interpretation

---

[31] These general corporate powers are subject to exceptions relating to the size and composition of the board of directors and provisions relating to the merger or dissolution of the corporation.

34

of Section 170. The question presented in *Catholic Charities* was whether the denial of an exemption from unemployment compensation taxes violated the First Amendment. *Id.* at 241. Although Solomon did not raise any claims under the First Amendment or Section 5 of the Kentucky Constitution below, we ordered the parties to submit supplemental briefing on the applicability, if any, of *Catholic Charities* to the present appeal.

In *Catholic Charities*, the Supreme Court examined a Wisconsin law which granted an exemption from unemployment compensation taxes to "nonprofit organizations 'operated, supervised, controlled, or principally supported by a church or convention or association of churches,' but only if they are 'operated primarily for religious purposes.'" *Id.* at 242 (quoting Wis. Stat. § 108.02(15)(h)(2)). Notably, Catholic Charities' character as a religious organization was not in dispute. *Id.* at 245.

Instead, the denial of the exemption was solely premised upon a determination that the activities of Catholic Charities were "secular in nature, not religious." *Id.* (internal quotation omitted). The Wisconsin Supreme Court affirmed the denial of the exemption, reasoning Catholic Charities "neither attempt to imbue program participants with the Catholic faith nor supply any religious materials to program participants or employees[.]" *Id.* at 245-46 (citation omitted). The Wisconsin Court further relied upon the fact that "[b]oth employment with the organizations and services offered by the organizations are open to all participants regardless of religion, and the charitable services

offered by the subentities could be provided by organizations of either religious or secular motivations." *Id.* at 246 (internal quotation omitted).

The Supreme Court reversed and observed, "[a] law that differentiates between religions along theological lines is textbook denominational discrimination." *Id.* at 248. The Court further explained:

> This case involves that paradigmatic form of denominational discrimination. In determining whether petitioners qualified for the tax exemption . . . the Wisconsin Supreme Court acknowledged that [Catholic Charities] are controlled by a church, the Roman Catholic Diocese of Superior, thereby satisfying one of the exemption's two criteria. The court's inquiry instead turned on whether [Catholic Charities] are "operated primarily for religious purposes." On that criterion, the court recognized that petitioners' charitable works are religiously motivated. The court nevertheless deemed [Catholic Charities] ineligible for the exemption . . . because they do not "attempt to imbue program participants with the Catholic faith," "supply any religious materials to program participants or employees," or limit their charitable services to members of the Catholic Church. Put simply, [Catholic Charities] could qualify for the exemption while providing their current charitable services if they engaged in proselytization or limited their services to fellow Catholics.
>
> [Catholic Charities'] Catholic faith, however, bars them from satisfying those criteria. . . .
>
> Wisconsin's exemption, as interpreted by its Supreme Court, thus grants a denominational preference by explicitly differentiating between religions based on theological practices. Indeed, petitioners' eligibility for the exemption ultimately turns on inherently religious choices (namely, whether to proselytize or serve only co-religionists), not "'secular criteria'" that "happen to have a 'disparate impact' upon different religious organizations."

*Id.* at 249-50 (internal citations omitted). The Supreme Court further held that the disparate treatment of Catholic Charities did not withstand strict scrutiny. *Id.* at 254.

Importantly, the classification of Catholic Charities, as a "nonprofit organization[] 'operated, supervised, controlled, or principally supported by a church or convention or association of churches,'" was not in dispute relative to the requirements of the applicable Wisconsin statute. *Id.* at 242, 245. By contrast, the classification of Solomon as an institution of religion, within the meaning of Section 170, is precisely the question at the heart of the present appeal. *See Kesselring*, 186 S.W.2d at 404. Under Kentucky law, an "organization must reasonably come under the classification of" an institution of religion "[t]o be exempt from the payment of taxes[.]" *Id.* We do not read *Catholic Charities* to delimit the authority of state courts to interpret the scope of tax exemptions under state law so long as denominational preferences and religious discrimination are avoided.

To be clear, our holding today is not based on a determination that Solomon's activities are inherently secular in nature or otherwise lack a sufficiently religious purpose or motivation relative to the practices of other religions or denominations. The analysis under Section 170 focuses, instead, on the taxpayer's classification as an institution of religion and whether such a claimant is a church, religious sect, society or denomination, or otherwise constitutes a board, agency, or nonprofit activity conducted by a general or parent church. Thus, we express no opinion on the theological significance of Solomon's activities and simply conclude that Solomon is not within the category of institutions to which the privilege of a property tax exemption has been conferred by Section 170 of the Kentucky Constitution.

### C. We decline to further interpret the "owned and occupied" requirement under Section 170

Having determined Solomon does not qualify as an institution of religion for the purpose of Section 170, we need not reach the question of whether the phrase "owned and occupied by . . . institutions of religion" requires unity of ownership and occupation. Indeed, "no further questions need be determined" where a claimant fails to establish the requisite character of ownership. Renner, *supra* note 20, at § III(b)1. Moreover, it is the longstanding practice of this Court to refrain from addressing constitutional questions unless absolutely necessary to a decision on the merits of the case. *Commonwealth v. Bredhold*, 599 S.W.3d 409, 414 (Ky. 2020) (citing *Blair v. United States*, 250 U.S. 273, 279 (1919), and *Louisville/Jefferson Co. Metro Gov't v. TDC Group, LLC*, 283 S.W.3d 657, 660 (Ky. 2009)). Additionally, Kentucky "courts do not function to give advisory opinions, even on important public issues, unless there is an actual case in controversy." *Philpot v. Patton*, 837 S.W.2d 491, 493 (Ky. 1992). Because Solomon is not an institution of religion, we decline to adjudicate the issue whether unity of ownership and occupation is required under Section 170. Thus, we must "leave this question for another day." *Kulkarni v. Horlander*, 701 S.W.3d 181, 189 n.8 (Ky. 2024).

### CONCLUSION

Accordingly, the decision of the Court of Appeals is reversed and remanded with instructions to reinstate the denial of the exemption by the Tax Board, consistent with this opinion.

All sitting.  Lambert, C.J.; Conley, Goodwine, and Thompson, JJ., concur.  Keller, J., concurs in result only.  Bisig, J., dissents with separate opinion.

BISIG, J., DISSENTING:  I respectfully dissent from the well-written Majority Opinion and would affirm the Court of Appeals in full.  I conclude that although The Solomon Foundation is involved in financial ventures, it nonetheless is an "institution of religion" for purposes of Section 170 because the income of those ventures is used solely for the purpose of advancing the foundation's religious aims.  I also further conclude that while The Solomon Foundation itself does not occupy the property at issue, it is nonetheless entitled to the religious tax exemption because the foundation rents the property to another religious entity.  I would therefore affirm the Court of Appeals in full.

COUNSEL FOR APPELLANT,
BILL DUNN, MCCRACKEN COUNTY
PROPERTY VALUATION ADMINISTRATOR:

Glenn D. Denton
Denton Law Firm, PLLC

Cade Foster
McCracken County Attorney


COUNSEL FOR APPELLANT,
COMMONWEALTH OF KENTUCKY,
FINANCE AND ADMINISTRATION CABINET,
DEPARTMENT OF REVENUE:

Bethany Atkins Rice
Douglas M. Dowell
Richard William Bertelson III
Office of Legal Services

COUNSEL FOR APPELLEE,
THE SOLOMON FOUNDATION:

Mark A. Loyd
Bailey Roese
Stephanie M. Bruns
Dentons Bingham Greenbaum LLP


COUNSEL FOR AMICUS CURIAE,
COMMONWEALTH OF KENTUCKY:

Russell M. Coleman
Attorney General of Kentucky

Matthew F. Kuhn
Solicitor General

Sarah N. Christensen
Jenna M. Lorence
Assistant Solicitors General

COUNSEL FOR AMICUS CURIAE,
THE KENTUCKY COUNCIL OF CHURCHES:

R. Kent Westberry
Bridget M. Bush
Landrum & Shouse, LLP


COUNSEL FOR AMICUS CURIAE,
CROSSROADS CHRISTIAN CHURCH
OF GRAND PRAIRIE, TEXAS AND
CHRIST'S CHURCH OF THE VALLEY
OF PEORIA, ARIZONA:

Robert B. Craig
Jeremy Hayden
Taft Stettinius & Hollister LLP